IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

        V.                                              No.10-40098-01/02-SAC

FERNANDO MERAZ and
ERMINDA J. RAMIREZ,

        Defendants.

MEMORANDUM AND ORDER

This case arises from a traffic stop of a motor home which gave rise to a search which revealed several suitcases and other bags containing approximately 323 pounds of marijuana. Each defendant is charged with one count of possession of marijuana with intent to deliver. The case comes before the court on the following motions: Motion to Sever by defendant Meraz; Motion to Suppress by defendant Meraz; Motion to Suppress by defendant Ramirez; and Motion for Joinder by defendant Ramirez. The government has filed a joint response. An evidentiary hearing was held on March 22nd, and the Court permitted the parties to file supplemental briefs. All parties have done so. Having reviewed the supplemental briefs, the Court is ready to rule.

I. **Motions to Suppress**

Defendant Meraz challenges the scope of the traffic detention, the search of the motor home, and the voluntariness of any statements he made, but does not challenge the initial stop. Defendant Ramirez additionally challenges the initial stop.

        **Summary of Facts**

On September 17, 2010, Trooper Nicholas of the Kansas Highway Patrol observed a motor home traveling eastbound on Interstate 70 in Wabaunsee County, Kansas. He could not see the vehicle's tag, so decided to follow it. The Trooper pulled behind the motor vehicle and observed that defendant's vehicle had a license tag on it, but it stated the expiration date of July of 2010. Trooper Nicholas testified that after seeing the outdated sticker and before he stopped the vehicle, he contacted his dispatcher who confirmed the tag was expired. After seeing the expired tag, he decided to stop the motor home. Trooper Nicholas testified that when he sees a tag that appears to be expired, his practice is to stop the vehicle, because it's a violation of Kansas law not to have a current tag with a current registration sticker.

Trooper Nicholas activated his lights and the motor vehicle stopped. He approached the vehicle on the passenger side and spoke to the driver, defendant Meraz. He explained that the tag was expired, learned that the vehicle had been rented by defendant Ramirez, and asked for their paperwork. He received the insurance and the rental papers, and learned that neither defendant had a driver's license or any other identification with them. He reviewed the rental agreement and noted its stated date of departure from Albuquerque, New Mexico, was September 15th, and the return date was September 20th, 2010.

Trooper Nicholas asked defendant Meraz about his travel plans. He was initially informed that defendants were traveling to Chicago to visit his sister and was later informed they were going there to be there a couple of days because his mother was having an operation for "vertigo veins." Because neither defendant had any identification, Trooper Nicholas asked them to write down their names, dates of birth

and addresses. Trooper Nicholas asked where they lived, whether either had any form of identification, and which state had issued defendant Meraz's previous driver's license. Defendant Meraz stated that his last license was from Illinois. Trooper Nicholas reaffirmed that the tag had expired in July of 2010, and stated that he had run it through dispatch, who confirmed it had expired.

Trooper Nicholas then returned to his patrol car with the paperwork, requested a back-up trooper for his safety, and requested that dispatch check the identification information given by defendants.

Trooper Nicholas then reapproached the motor vehicle and asked defendant Meraz to exit the vehicle. While standing outside the vehicle, Trooper Nicholas asked about weapons, and defendant Meraz produced a knife (four inches long when folded) which he gave to the trooper. Trooper Nicholas did a consensual pat down, then asked about travel plans. Defendant Meraz stated that his mother's operation was on Wednesday or Monday, "one of the two," that his mother was still at home, and that her operation was for vericose veins. He stated that he had lived in New Mexico for 12 or 15 years off and on, that he had not had a license for "a while" but was fighting for it, and that his girlfriend, defendant Ramirez, had a valid driver's license. Trooper B.K. Smith arrived and Trooper Nicholas soon thereafter returned defendant Meraz to the motor home, conferred with Trooper Smith, and requested a III check.

Trooper Nicholas found both defendants to be nervous throughout the stop, found the length of the rental period concerning because those vehicles are expensive, defendant had rented the vehicle in Albuquerque or Rio Rancho, New Mexico, the rental period (from the 15th to the 20th) was expiring in two days and they had not yet reached

3

their destination (Chicago), and defendants could have rented a car for only two people. Trooper Nicholas also found the stated reason for the trip to be suspicious because defendant Meraz initially stated they were going to see his sister, but later said they were going to Chicago for his mother's surgery. Defendant had at first offered one medical condition for his mother, then another. Trooper Nicholas found it unusual that he could see no personal items in the motor home from his view standing at the door, because he can usually see at least some such items in motor homes. Trooper Nicholas had been trained to look for drugs flowing from the southwest to the northeast, and found it significant that defendants were coming from New Mexico, which borders Mexico, a source area, and were going to Chicago, a large urban area well known for its use of drugs.

Trooper Nicholas decided to seek consent to talk further with defendants. Trooper Nicholas returned to the motor home and told defendant Ramirez she would have to drive, since she had a valid license. He then told defendants he was not going to issue a ticket, returned all their paperwork, and told defendants to have a safe trip. One of the defendants responded, "Thanks," and asked where a gas station was, and he told them. Trooper Nicholas again told defendants, "Have a safe trip," and took a step away from the vehicle or pivoted, before turning back to the vehicle.

Trooper Nicholas then asked defendant Meraz if he would answer some quick questions, and defendant Meraz admits that he agreed. Trooper Nicholas asked whether they were going to extend the rental period, which expired in three days, and why they had not rented a car instead of a motor home. Defendants responded that they intended to extend the rental period and that they planned to pick up family and

4

bring them back with them. Trooper Nicholas then asked whether they had anything illegal in the vehicle, such as weapons, guns, or drugs, to which defendant Meraz responded, "Just the knife," which the trooper had previously seen.

Trooper Nicholas then requested consent to search the vehicle. Both defendants were in or near the door to the vehicle. Trooper Nicholas testified that when he requested consent to search, defendant Meraz said "Yeah," then the trooper asked, "Is that OK?" and defendant Ramirez replied, "Yes." Trooper Smith testified that he was present when Trooper Nicholas asked for consent to search. He stood on the passenger side of the motor home, near its rear wheels, approximately 12' away from the door to the motor home. He heard Trooper Nicholas ask for consent, and heard defendants answer affirmatively. Conflicting testimony was offered by defendant Ramirez, who stated that when asked for consent, defendant Meraz indicated no by shaking his head. She testified that she was on the phone and never responded to the trooper's question because he was not looking at her or directing the question to her. The trooper's questions to defendant Meraz were not asked separately, but all at once, in a "run on." She stated that she was never asked for consent, and never consented to a search.

Trooper Nicholas then directed defendant Ramirez to step down from the motor home, and asked defendants if there was anything in there he needed to know about, to which the defendants did not respond. Defendant Ramirez admitted that she stepped out of the vehicle and saw the trooper enter the motor home, but did not say anything to either Trooper Nicholas or to Trooper Smith, who stood on the threshold. Neither she nor defendant Meraz objected to the search.

After consent was given, Trooper Smith told defendants to stand in front of the motor home, where he kept an eye on them while Trooper Nicholas searched the vehicle. Trooper Nicholas found suitcases and other bags full of marijuana in the motor home. When Trooper Nicholas came out and said he had found marijuana in the motor home, Trooper Smith arrested and handcuffed both defendants. He testified that he spoke with them shortly thereafter, and advised them of their rights by reading them from his Miranda card in full. Neither defendant voiced any lack of understanding, and both remained silent. No contradictory testimony was offered relating to Miranda warnings.

## A. Initial Stop

The sole proffered justification for the traffic stop was an expired tag on the motor vehicle. Trooper Nicholas testified that he observed the tag which appeared to be expired in July of 2010, and that dispatch confirmed the tag was in fact expired before he stopped the motor home. Defendants contend that neither the video/audio tape of the stop nor the audio tape of dispatch communications includes any confirmation from dispatch prior to the stop that defendant's vehicle had an expired license tag. *See* Gvmt. Exh. 1; Def. Exh. 400. Defendants thus challenge Trooper Nicholas's credibility, and allege he had no reasonable suspicion to warrant a traffic stop.

**General law**

When an officer initiates a routine stop for an observed traffic violation, the constitutionality of the seizure is analyzed pursuant to the two-prong test provided by *Terry v. Ohio*, 392 U.S. 1 (1968). *United States v. Clarkson*, 551 F.3d 1196, 1201 (10th Cir. 2009). The first inquiry is whether the stop was justified at its inception by

6

reasonable suspicion the driver committed a traffic violation. *United States v. Martinez*, 512 F.3d 1268, 1272 (10th Cir. 2008).

**Analysis**

Trooper Nicholas testified that before he stopped the motor home, he saw the motor home's license tag and believed it to be expired, and had received confirmation from dispatch that its registration sticker was in fact expired. Driving with an expired license plate is a misdemeanor under Kansas law. *See* KSA §§ 8-133, 8-142, 8-149.

The video/audio of the traffic stop does not begin until Trooper Nicholas activated his emergency lights immediately prior to the stop, so does not capture any calls to dispatch before that time. The dispatch tape, however, records his request to run the tag, and dispatch's response that the tag expired on July 31, 2010. Trooper Nicholas then asks, "You do show it's expired?" and dispatch responds affirmatively. Unfortunately, the dispatch tape itself is of little value, as if fails to establish when that request occurred. This conversation is closely followed by the Trooper's request to run defendant's names and addresses, which he received during the stop. Defendants imply that Trooper Nicholas did not receive confirmation from dispatch that the tag was expired until soon before he ran defendants' identification, both of which would have been after the stop.[1] However, the video/audio which begins at the initial stop does not reflect Trooper Nicholas asking to run the tag or saying, "You do show it's expired," which suggests that this communication with dispatch was before the stop.

---

[1]Because no foundation was laid and no testimony was given about the dispatch tape, the Court does not know whether or not it has been condensed, spliced together, or otherwise altered, or whether the time intervals on the tape are accurate. Although the content of the communications may be accurate, their timing is not necessarily so.

7

Regardless of whether dispatch did or did not confirm the expired tag before the stop began, the court finds that at the time of the initial stop, Trooper Nicholas had a reasonable suspicion that defendants had committed a traffic infraction or a crime. A trooper's testimony alone is sufficient, if credible, to establish reasonable suspicion to support a traffic stop. *United States v. White*, 584 F.3d 935, 946 (10th Cir. 2009). *Cf United States v. Sergei Paul Ludwig*, __ F.3d __ (10th Cir. April 22, 2011). Accordingly, confirmation by dispatch is not necessary to establish the legality of the initial stop. Nothing on either exhibit impeaches the trooper's Testimony. But even assuming that Trooper Nicholas may have erred in recalling that he contacted dispatch about the expired tag before the stop, rather than during the stop, such a failure in recollection is not so serious as to impeach his testimony that he saw the tag and believed it to be expired before he stopped the vehicle. Because Trooper Nicholas credibly testified that he had reasonable suspicion to believe that the defendant had violated one of the multitude of applicable traffic and equipment regulations of the jurisdiction, the initial stop shall be upheld. *See Whren v. United States*, 517 U.S. 806, 810 (1996).

**B. Detention**

Defendant Meraz contends that he was unlawfully detained "for the purpose of allowing time for a backup trooper to arrive," and this detention was not reasonably related to the reason for the traffic stop. Dk. 28, p. 4. The backup trooper arrived approximately eight and one-half minutes into the stop. Approximately 12 minutes passed between the initial stop and the trooper's return of defendants' documents.

**General law**

In determining whether a traffic stop was "reasonably related to the

circumstances which justified [the stop] in the first place." *United States v. Eckhart*, 569 F.3d 1263, 1273 (10th Cir.2009), *cert. denied*, --- U.S. ----, 130 S.Ct. 1752 (2010), the court focuses "on the reasonableness of the traffic stop in light of both the length of the detention and the manner in which it was carried out." *United States v. Valenzuela*, 494 F.3d 886, 890 (10th Cir. 2007). This court looks at the "totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quotations omitted). In doing so, this court "accord[s] appropriate deference to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." *United States v. Alvarez*, 68 F.3d 1242, 1244 (10th Cir.1995) (citation omitted). Officers may ask questions outside the scope of the traffic stop so long as the questions do not appreciably prolong the length of the stop. *United States v. Polly*, 630 F.3d 991, 997 (10th Cir. 2011); *United States v. Simpson*, 609 F.3d 1140 (10th Cir. 2010).

"During a routine traffic stop, the detaining officer may request a driver's license and vehicle registration, run a computer check on the car and driver, and issue a citation." *United States v. Soto*, 988 F.2d 1548, 1554 (10th Cir. 1993). Officers may ask a driver to step out of the vehicle. *See United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir.1994) (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 111, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (per curiam)).

**Analysis**

Here, Trooper Nicholas spent approximately four minutes at the motor home during his initial conversation with the defendants. Although this may be longer than

9

some initial contacts, the circumstances warrant the length. Defendant Meraz was driving the motor home without a valid driver's license. Neither defendant had any identification on them, so both were asked to write down their identifying information and did so.

Trooper Nicholas then returned to his patrol car for approximately two minutes, where he relayed information to his dispatcher and requested back up. Before receiving any results, he re-approached the motor home and asked defendant Meraz to step back near his patrol car to speak with him.

The two stood outside the patrol car for just over three minutes, while Trooper Nicholas awaited word from dispatch. During this questioning, the back up officer arrived. Trooper Nicholas then contacted the dispatcher to request they add a "Triple III" wants and warrants check to his initial request, for which he had not yet received a response.

Trooper Nicholas then walked defendant Meraz back to the motor home, talking about the date on the license plate and establishing that Ramirez was Meraz's girlfriend. The trooper returned defendant's knife and spoke briefly with defendants about where they had rented the motor home, before returning to his patrol car.

In his patrol car, Trooper Nicholas told Trooper Smith he intended to conclude the traffic stop and request consent to search. Trooper Nicholas then re-approached the door of the motor home, while Trooper Smith remained near the motor home's back tire. When Trooper Nicholas returned the documents, informed defendants Ramirez would have to drive, said that he was not going to write them a ticket, wished defendants a safe trip, and broke contact by stepping away momentarily from the motor home, the

10

traffic stop was terminated and the encounter became consensual. *See United States v. Bustillos-Munoz*, 235 F.3d 505 (10th Cir. 2000) (absent a coercive show of authority, returning a driver's documentation ends a traffic detention).

Under the totality of the circumstances, both the length of the detention and the manner in which it was carried out were reasonable. The majority, if not all, of the questions to the defendants were asked while Trooper Nicholas was waiting for a response from dispatch. Neither the questions he asked, nor his waiting for back up to arrive appreciably prolonged the length of the stop. In short, the record fails to show that Trooper Nicholas detained either defendant beyond the time it took to issue a traffic ticket.

Alternatively, the government contends that because Trooper Nicholas had probable cause to arrest defendant Meraz upon seeing his operation of the motor home having an expired license plate, any detention beyond the initial purpose of the traffic stop was reasonable.

The Court agrees. Operating a motor vehicle without a valid license plate and operating a motor vehicle without a valid driver's license are both misdemeanor offenses in Kansas. *See* KSA § 8-142, 8-149, 8-244. Because these misdemeanors were committed in the presence of Trooper Nicholas, he could have arrested defendant Meraz for either of both of them. *See* KSA § 22-2401(d) (authorizing warrantless arrest for any crime committed in the officer's view); 8-2118 (excluding 8-142 and 8-244 from the definition of a traffic infraction, thus including them as crimes.) Because probable cause to arrest defendant Meraz existed from the initial moment of the traffic stop and throughout the entire time of the alleged illegal detention, defendants' claim that they

11

were illegally detained necessarily fails, regardless of Trooper Nicholas's subjective intent. *See United States v. Santana-Garcia*, 264 F.3d 1188, 1194 (10th Cir. 2001); *United States v. Lara-Garcia*, 478 F.3d 1231, 1234 (10th Cir. 2007); *United States v. Treto-Haro*, 287 F.3d 1000, 1006 (10th Cir. 2002) It is irrelevant if Trooper Nicholas did not rely on either of the Kansas misdemeanor violations as the basis for detaining defendant Meraz. *See Polly,* 630 F.3d at 997; *Howards v. McLaughlin*, 2011 WL 856275, 7 (10th Cir. 2011). This rationale provides an alternate basis for upholding the detention.

## C. Search of motor home

Defendants contend that neither of them consented to a search of the motor home and that no other basis justifies the illegal search. The government contends solely that the search was justified by consent.

### General law

"A warrantless search of a suspect's premises is unreasonable per se under the Fourth Amendment unless the government shows that the search falls within one of a carefully defined set of exceptions, such as a valid consent." *United States v. Glover*, 104 F.3d 1570, 1583 (10th Cir. 1997). The government has the burden of proving that consent to a warrantless search was, in fact, freely and voluntarily given. *United States v. Kimoana*, 383 F.3d 1215, 1225 (10th Cir. 2004). The validity of a consent-based search is based upon the totality of the circumstances as to "whether the consent was the product of an essentially free and unconstrained choice by the maker or whether it was the product of duress or coercion, express or implied." *United States v. Sawyer*, 441 F.3d 890, 895 (10th Cir.) (quotation and brackets omitted), *cert. denied,* 549 U.S.

823 (2006). General consent to search a car includes consent to search containers within that car which might bear drugs. *United States v. Bustillos-Munoz*, 235 F.3d 505, 515 (10th Cir. 2000).

**Analysis**

The Court is faced with conflicting testimony. Trooper Nicholas testified that he asked for and received consent from both defendants. That testimony was confirmed by Trooper Smith, who testified that he was present and heard Trooper Nicholas ask for and receive consent. Defendant Ramirez testified that neither defendant gave consent. She stated that when Trooper Nicholas asked for consent, defendant Meraz shook his head to indicate "no," and that she remained silent. Defendants attempt to impeach the troopers' testimony by the audio tape, which they allege captures Trooper Nicholas's audible request for consent, but not any consent, and by Trooper Nicholas's report, which did not state that defendant Ramirez gave consent, although Trooper Nicholas testified that she did.

In weighing the testimony of the witnesses, the Court has considered the witnesses' appearance and manner while testifying, their means of knowledge, apparent intelligence or ignorance, interest or want of interest in the outcome of the case, and all other facts and circumstances appearing in the hearing to aid it in arriving at the truth. The Court finds the testimony of the troopers to be the most credible on this issue. The Court has carefully and repeatedly listened to the video/audio tape of the stop and finds that it does evidence an audible, although unintelligible, response from one of the defendants to the trooper's request for consent to search. Specifically, Trooper Nicholas asks: "Can I search real quick? Can I search your vehicle? Is that

13

OK?" An audible but unintelligible response is then made before Trooper Nicholas follows up by saying, "OK." Gov. Exh. 1, at approximately 14:03 minutes. This lends some support to the trooper's testimony that consent was given, and refutes defendant Ramirez's testimony that both defendants remained silent. Even absent the tape, the Court credits the testimony of both troopers, whose interest in the outcome of the case is much less than that of defendant Ramirez.

Further, it is undisputed that immediately after the trooper asked for consent, he asked defendant Ramirez to step out of the motor vehicle and for both defendants to step to the front of the vehicle, where Trooper Smith watched them while Trooper Nicholas searched the vehicle. Neither defendant objected to the search, although an objection would have been expected had neither defendant consented to search. That neither defendant voiced to the officers any objection to the continuation of the search in any manner after it began is indicative of consent. See *United States v. Sanchez*, 608 F.3d 685, 691 (10th Cir. 2010); *United States v. Pena*, 920 F.2d 1509, 1515 (10th Cir.1990). "A defendant's silence and acquiescence may support a finding of voluntary consent. *Gordon,* 173 F.3d at 766." *United States v. Patten*, 183 F.3d 1190, 1194 (10th Cir. 1999). The Court additionally finds that defendants' consent was a free and unconstrained choice by defendants, and was not the product of duress or coercion. Accordingly, the search of the motor home was a legal, consensual search.

The Court finds it unnecessary to reach the government's alternative arguments that reasonable suspicion justified any detention after return of defendants' documents, or that a good faith exception applies. *See Herring v. United States*, 555 U.S. 135 (2009); *United States v. Leon*, 468 U.S. 897 (1984).

**D. Statements/Miranda**

Defendants both contend that their statements should be suppressed as fruit of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471 (1963). Because the Court has found that there was no Fourth Amendment violation, this argument fails.

Additionally, both defendants contend they were not given *Miranda* warnings before their custodial interrogation.

**General law**

When a Miranda violation is alleged to have occurred, the burden of proof rests with the government to prove the validity of the waiver by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986). This inquiry "is a legal question requiring independent factual determination." *United States v. Hernandez*, 913 F.2d 1506 (10th Cir.1990) (quoting *Miller v. Fenton*, 474 U.S. 104, 110, 106 S.Ct. 445, 449-50, 88 L.Ed.2d 405 (1985)). The court must determine that:

> "First, the relinquishment of the right must be voluntary in the sense that it was a product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Hernandez*, 913 F.2d at 1509 (quoting *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986)).

*United States v. Johnson*, 42 F.3d 1312, 1318 (10th Cir. 1994).

**Analysis**

The sole testimony in this regard was given by Trooper B.J. Smith, who credibly testified that he gave both defendants Miranda warnings at the time of their arrest, before any custodial interrogation began. No indicia of coercion appear in the record. Accordingly, defendants' statements given to officers after their Miranda warnings were pursuant to valid waivers and are not excludable.

## II. Motion to Sever (Dk. 26)

Defendant Meraz seeks to sever his trial from his co-defendant's trial, claiming that defendant Ramirez implicated him in her post-arrest statements which raises a *Bruton* problem. The government responds that both defendants provided statements to law enforcement officers regarding their involvement: Meraz gave a brief statement blaming Ramirez, and Ramirez gave a longer statement implicating herself and defendant Meraz. No testimony or exhibits relating to this issue were presented at the hearing.

### General law

The Confrontation Clause of the Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. Amend. VI. In *Bruton v. United States*, 391 U.S. 123 (1968), the Supreme Court held that despite limiting instructions, the introduction of a co-defendant's out-of-court confession directly implicating the defendant as his accomplice violated the defendant's Sixth Amendment right to cross-examine witnesses. In *Richardson v. Marsh,* 481 U.S. 200 (1987), the Court limited the scope of *Bruton*, holding that a redacted confession that omitted all references to another co-defendant, along with the administration of appropriate limiting instructions, was

admissible and did not violate the Confrontation Clause. There, the confession was not incriminating on its face and became incriminating only when linked with other evidence. Subsequently, the Court in *Gray v. Maryland* clarified that "*Richardson* must depend in significant part upon the kind of, not the simple fact of, inference." 523 U.S. 185, 196 (1998). Thus the details of the incriminating statement must be examined.

Also, the court must consider whether redaction may cure a potential *Bruton* problem. The Tenth Circuit has held that *Bruton* is not violated when a defendant's name is replaced with a neutral pronoun or phrase, provided that the incrimination of a defendant is only by reference to evidence other than a redacted statement and a limiting instruction is given to the jury. *United States v. Verduzco-Martinez*, 186 F.3d 1208 (10th Cir.1999). Additionally, in *United States v. Green,* 115 F.3d 1479 (10th Cir.1997), the Tenth Circuit held that "if the confession ... does not incriminate the defendant, then it may be admitted with a proper limiting instruction even though other evidence in the case indicates that the neutral pronoun is in fact a reference to the defendant." *Id.* at 1484. "Only where the inculpatory inference can be made immediately in the mind of a reasonable juror is the statement protected by *Bruton* and any curative instruction insufficient." *United States v. Rahseparian*, 231 F.3d 1267, 1278 (10th Cir. 2000).

**Analysis**

This court cannot make an accurate determination of whether severance is necessary without examining the precise statements the defendants allege are incriminating, then determining whether redaction is possible. Because no statements have been provided to the court, and because one defendant may plead before trial,

17

this motion shall be taken under advisement.

### III. Motion for Joinder

Defendant Ramirez moves to join in "any and all pretrial motions ... which may be applicable and beneficial to [her]." Dk. 30. The government has not responded to this request. At the hearing, counsel for defendant Ramirez stated his intent not to join in the motion to sever. The Court will not take it upon itself to decide which motions filed by the co-defendant may be "applicable" or "beneficial" to defendant Ramirez, so grants this motion only to the extent that defendant Ramirez adopts the arguments made by defendant Meraz in his pending suppression motion.

IT IS THEREFORE ORDERED that the motion to sever (Dk. 26) is taken under advisement, the motion to join (Dk. 30) is granted in part, and the motions to suppress (Dk. 28, 29) are denied.

Dated this 2nd day of May, 2011.

s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge